IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Majken Janelle Robinson, | ) | C/A No.: 1:11-3082-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

   A.      Procedural History

On December 11, 2008, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on May 18, 2008. Tr. at 140–45. Her applications were

1

denied initially and upon reconsideration.  Tr. at 81, 83, 85–86.  On February 18, 2011, Plaintiff had a hearing before an Administrative Law Judge ("ALJ").  Tr. at 35–80 (Hr'g Tr.).  The ALJ issued an unfavorable decision on March 1, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 17–29.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 10, 2011.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 36 years old at the time of the hearing.  Tr. at 39.  She completed high school and two years of college.  Tr. at 40.  Her past relevant work ("PRW") was as a cashier, tile inspector, timekeeper, supply clerk, movie rental clerk, pizza delivery driver, shipping clerk, fast food worker, and hotel maid.  Tr. at 72–73.  She alleges she has been unable to work since May 18, 2008.  Tr. at 140.

2.    Medical History

On July 22, 2003, an MRI of Plaintiff's lumbar spine revealed degenerative disk desiccation at L3–4 without interspace narrowing or other abnormality.  Tr. at 352.  The MRI also revealed contact and compression of the L5 root.  *Id.*

Plaintiff underwent a nerve conduction study on August 7, 2006, which revealed an entrapment neuropathy at the ulnar nerve at the elbow.  Tr. at 264–66.

2

Plaintiff was seen by Dr. Amruthavalli Muthu and Laurie Wilson, MSW, at Daymark Recovery Services on May 29, 2007, January 8, 2008, and March 20, 2008, for major depressive disorder.  Tr. at 287, 291–92.  Her GAF score was twice noted to be 50.  Tr. at 291–92.

On June 5, 2008, Ms. Wilson saw Plaintiff for recurrent major depressive disorder.  Tr. at 280.  Plaintiff reported disturbed sleep, poor concentration, decreased appetite and motivation, depressed mood, excessive worrying, and crying spells.  *Id.*  Ms. Wilson described Plaintiff's mood as depressed with full effect and noted that her thought processes, content, and perception were normal.  *Id.*  Plaintiff had a GAF score of 45.  Tr. at 288.  She also saw Dr. Muthu, who noted she was doing reasonably well on current medications (Zoloft) and was not experiencing any side effects from the medications.  Tr. at 286.

On August 28, 2008, Plaintiff again saw Dr. Muthu for pharmacologic management.  Tr. at 285.  Plaintiff reported "doing very well still" and denied any symptoms of depression or anxiety.  *Id.*

On October 20, 2008, Plaintiff first presented to Margaret J. Weston Community Health Centers ("MJWCHC") complaining of headaches, back pain, urinary incontinence, diabetes mellitus, and depression.  Tr. at 301.  Her right hip was stiff to flexion.  *Id.*  Plaintiff was also treated at MJWCHC on October 21 and October 28, 2008, for prescription changes and tender, enlarged ovaries.  Tr. at 298–300.

3

On December 16, 2008, Plaintiff visited MJWCHC and reported problems with her knees. Tr. at 296. She also felt that she had Restless Leg Syndrome ("RLS"). *Id.* She stated that Naproxen was not working and wanted stronger pain medicines. *Id.* The physician wrote that she possibly needed more trigger point injections in her back and that her last injection only lasted two weeks. *Id.* The physician diagnosed back pain, headaches, upper back pain, and RLS and prescribed Requip and Tramadone. *Id.*

In December 2008, Plaintiff completed a Function Report and reported that she lived in a mobile home with her parents and that during a typical day she would take care of her personal needs, eat regular meals, go outside and walk short distances on a couple of occasions (weather permitting), rest with her legs in a reclined position, watch television, and use the computer. Tr. at 181–188. She stated that she cared for her dogs. Tr. at 182. She reported that before her alleged impairments, she could stand, walk, and sit for long periods of time. *Id.* She indicated that she prepared meals (with a chair to sit on), did the laundry, washed dishes, and vacuumed. Tr. at 183. She stated she drove a car and shopped for groceries and clothes both in stores and by computer. Tr. at 184. Plaintiff reported that she was able to pay bills, count change, handle a savings account, and use a checkbook and money orders. *Id.* Plaintiff also indicated that she engaged in hobbies and social activities including playing games on the computer, arts and crafts projects, and going out to eat. Tr. at 185. She reported difficulties with paying attention, but stated she had no problem following written instructions. Tr. at 186. She stated that

4

she quit or was fired from just about every job she has had because of problems getting along with others.  Tr. at 187.

On January 9, 2009, MJWCHC completed a questionnaire regarding Plaintiff at the request of the state agency.  Tr. at 306.  The physician indicated that Plaintiff had been treated for depression, but that medication had helped and psychiatric care had not been recommended.  *Id.*  He also indicated that Plaintiff was fully oriented, had intact thought processes, appropriate thought content, normal mood/affect, good attention/concentration, and good memory.  *Id.*

On January 29, 2009, state-agency consultant Kevin King, Ph.D., opined that Plaintiff was mildly restricted in activities of daily living; had moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and had no episodes of decompensation.  Tr. at 309–22.  He further opined that Plaintiff was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  Tr. at 323.  Dr. King opined that Plaintiff was also moderately limited in her ability to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday or workweek without interruptions from psychologically-based symptoms, to interact with the general public, and to accept instructions and respond appropriately to criticism from supervisors.  Tr. at 323–24.

5

On February 3, 2009, Susan J. Tankersley, M.D., examined Plaintiff and subsequently prepared a report regarding her observations and impressions. Tr. at 328–32. Dr. Tankersley noted Plaintiff's chief complaints as a history of lower back pain, polycystic ovarian syndrome, and ulnar neuropathy. Tr. at 328. Plaintiff reported a history of discectomy in 2003 that relieved most of her lower back pain, but stated that she re-injured her back in 2008. *Id.* She reported pain in the low back that radiated to both hips and down her right leg. *Id.* She stated that her back pain worsened during her menses and on prolonged sitting, standing, lifting, and bending. *Id.* Plaintiff indicated that she considered her polycystic ovarian disease to be her biggest problem. Tr. at 329. She reported that her heavy, irregular, and painful menses required frequent bathroom visits, but indicated that she had never had her hemoglobin or hematocrit checked and had never required a transfusion secondary to blood loss. *Id.* Plaintiff also reported pain, numbness and weakness of her arms and hands due to ulnar neuropathy and bilateral carpal tunnel syndrome. Dr. Tankersley noted that treatment for both conditions had been conservative. *Id.* Plaintiff exhibited appropriate affect and good communication skills, but reported a long history of depression. Tr. at 330.

On examination, Plaintiff had a slow and antalgic gait, edema in both hands, spotty paraesthesias in her right hand, normal strength, and full range of motion in her upper and lower extremities. Tr. at 331. Her upper extremity distal strength was 4/5 bilaterally and was pain limited. *Id*. She was unable to toe or heel stand and the Romberg test was positive. *Id.* She had muscle spasms from her midthoracic spine to her

low lumbar spine, had cervical spine paraspinous muscle spasms and trapezius muscle spasms, and was numb on palpation over the SI joints and midgluteal bilaterally. Tr. at 332. Dr. Tankersley indicated that Plaintiff had chronic lower back pain, but no current evidence of radiculopathy. *Id.* The doctor also noted Plaintiff's history of polycystic ovarian syndrome, left ulnar sensory neuropathy, depression, and obesity. *Id.* She indicated that Plaintiff had possible carpal tunnel syndrome and that she wanted to rule out onset of osteoarthritis in her shoulder and cervical spine. *Id.*

On February 23, 2009, Plaintiff underwent lumbar spine x-rays related to her low back pain and disability determination. Tr. at 333. The results were unremarkable and showed no advanced degenerative changes. *Id.*

On March 20, 2009, state-agency consultant Lindsey Crumlin, M.D., completed a physical residual functional capacity ("RFC") assessment and opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; could stand, walk, or sit about six hours in an eight-hour workday; and was unlimited in pushing and pulling. Tr. at 335–42. Dr. Crumlin further opined that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; and was limited to frequent handling, fingering, feeling, and reaching in all directions due to paresthesias. Tr. at 337–38. The doctor noted that Plaintiff had difficulty sitting during the interview and stood several times due to back pain. Tr. at 342.

Plaintiff presented to MJWCHC on May 20, 2009, complaining of tenderness and stiffness in her right hip. Tr. at 370. She received a referral to an orthopedist. *Id.*

7

On June 22, 2009, Plaintiff visited the emergency room complaining of back and hip pain. Tr. at 343–50. She was prescribed medication and discharged. Tr. at 349.

On July 23, 2009, Plaintiff visited Aiken-Barnwell Mental Health Center ("ABMHC") for an assessment by Dr. Patricia N. Watkins. Tr. at 375–77. Dr. Watkins noted that Plaintiff previously presented to ABMHC shortly after being denied disability, but never returned for follow-up. Tr. at 375. The doctor further noted that Plaintiff's mother stated that Plaintiff was appealing a disability denial and would be able to get food stamps and Medicare if someone would give a statement that she was disabled. *Id.* Plaintiff reported a chaotic upbringing and that she first sought mental health treatment in 2006 because of depression. *Id.* Dr. Watkins indicated that Plaintiff had no history of mental health hospitalization, but had a family history of depression. Tr. at 375–76. She noted that Plaintiff was anxious and frequently tearful. Tr. at 376. Dr. Watkins further noted that Plaintiff reported mild, continuous anxiety and indicated that Plaintiff did not "go anywhere" because of financial hardship. Tr. at 377.

On July 30, 2009, Plaintiff presented to MJWCHC because she needed a form completed for her disability evaluation. Tr. at 369. She saw Dr. Eric Schleuter and complained of pain in her hip. *Id.* Dr. Schleuter completed a Physical Capacities Evaluation Form indicating that Plaintiff could sit and stand one hour in an eight-hour workday, but could not walk at all during the workday. Tr. at 354. He opined that she could occasionally (defined as 0–33% of the time) lift one to 10 pounds, but never more than 10 pounds; could occasionally push and pull one to 10 pounds; and should never

8

stoop, kneel, crouch, twist, or climb stairs. *Id.* He further opined that Plaintiff could occasionally handle, finger, and feel; could occasionally reach above shoulder and at waist level, but never below waist level; and should never be exposed to heat. Tr. at 355. Dr. Schleuter concluded that Plaintiff had permanent limitations since 2003 that precluded her from working in a competitive work environment. *Id.*

Upon referral by Dr. Schleuter, Plaintiff underwent an MRI on August 12, 2009. Tr. at 357. It revealed L3–4 degenerative disc disease as well as reactive facet disease; L4–5 spinal stenosis; and L5–S1 bilateral recess stenosis. *Id.* The radiologist also noted that there may be a synovial cyst on the left that compromised the left S1 nerve root. *Id.*

On August 25, 2009, Plaintiff followed up with MJWCHC regarding her MRI results. Tr. at 368. She reported lumbar pain and exhibited lumbar tenderness and decreased range of motion. *Id.* The physician noted that she had degenerative disc disease and stenosis with pressure on the S1 root and referred her to neurosurgery. *Id.*

On October 13, 2009, Plaintiff again saw Dr. Watkins and reported that talking to a counselor had helped her a lot. Tr. at 378. Plaintiff stated that her crying spells still occurred, but were no longer constant and did not happen for "no reason." *Id.* Dr. Watkins diagnosed Plaintiff with recurrent major depressive disorder and dysthymic disorder and noted that she suspected possible bipolar disorder. Tr. at 379.

On November 9, 2009, state-agency consultant Lisa Klohn, Ph.D., completed a PRT indicating that Plaintiff had major dysthymic depressive disorder, anxiety, and

9

suspected bipolar disorder.  Tr. at 382–95.  Dr. Klohn's opinions regarding Plaintiff's functional limitations were the same as Dr. King's.  Tr. at 392, 396–97.

Plaintiff saw orthopedist Blake H. Moore, M.D., on December 29, 2009.  On examination, Plaintiff exhibited limited range of motion in her lumbar spine, both knees, and in her hips.  Tr. at 401.  She had positive straight leg raising on the right.  *Id.* Plaintiff's left grip strength was abnormal and affected her fine manipulation skills.  Tr. at 402.  She was unable to heel/toe walk.  *Id.*  Her gait had a wide stance and she used a walker part of the time.  *Id.*  There was sensory loss of her left ulnar.  *Id.*  Dr. Moore completed a Social Security Disability Report in which he noted Plaintiff's prior medical history.  Tr. at 403.  Plaintiff reported that she was unable to engage in sweeping, mopping, or vacuuming.  Tr. at 404.  She also stated that she was unable to go to the store for any type of shopping.  *Id.*  Dr. Moore reported the limitations described above, but noted Plaintiff demonstrated normal grip strength, full range of motion in her upper extremities and spine, normal motor strength, and normal deep tendon reflexes.  Tr. at 405.

On February 24, 2010, state-agency consultant Keith H. Langford, M.D., completed a physical RFC assessment opining that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; could stand, walk, or sit about six hours in an eight-hour workday; and was unlimited in pushing and pulling.  Tr. at 407–14.  Dr. Langford further opined that Plaintiff could occasionally climb ramp and stairs and stoop, kneel, and crouch; never climb ladders, ropes, or scaffolds; and never crawl.

Tr. at 409.  He concluded that Plaintiff had no manipulative limitations, but should avoid concentrated exposure to extreme heat and humidity and fumes, odors, dusts, gases, poor ventilation, and hazards.  Tr. at 411.  He also noted that Plaintiff should not control commercial vehicles and should not walk on uneven terrain.  *Id.*

On June 10, 2010, Plaintiff reported that she was "not bad" to Dr. Watkins.  Tr. at 429–30.  Dr. Watkins indicated that she had prescribed Celexa in place of Zoloft because Plaintiff could not afford the Zoloft.  Tr. at 419.  Plaintiff reported no adverse effects from the medication and stated that her mood had improved and she was less anxious.  *Id.* She noted that she could not sleep well due to her back pain.  *Id.*

Ms. Willis completed a progress summary regarding Plaintiff on July 28, 2010. Tr. at 432.  She noted that Plaintiff had only missed treatments when she was limited by her chronic pain and that she had made progress in identifying the triggers for anxiety and depression.  *Id.*  Plaintiff's GAF score was 64.  *Id.*  Her objective dates were extended another six months because treatment was necessary to promote further progress and ensure tenure in the community.  *Id.*

On June 15, 2010, Ms. Willis completed a Mental Health Questionnaire for Plaintiff.  Tr. at 416–22.  Ms. Willis indicated that she saw Plaintiff individually and in group therapy on a weekly or monthly basis for the previous year.  Tr. at 416.  She noted that Plaintiff was diagnosed with dysthymic disorder and moderate major depressive disorder and had a GAF score of 60.  *Id.*  Ms. Willis indicated that Plaintiff exhibited the following symptoms: poor memory, appetite disturbance, sleep disturbance, mood

11

disturbance, emotional lability, social withdrawal, decreased energy, anhedonia, feelings of guilt or worthlessness, difficulty concentrating, hostility, and irritability. Tr. at 417. Ms. Willis opined that Plaintiff's impairments could be expected to last at least 12 months and that her impairments or treatment would cause her to be absent from work three or more days per week. Tr. at 418. Ms. Willis further opined that Plaintiff's functional limitations included poor or no ability to: maintain regular attendance and be punctual within customary, usually strict, tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; set realistic goals or make plans independently of others; deal with the stress of semiskilled and skilled work; and use public transportation. Tr. at 419–20. She indicated that Plaintiff had extreme restrictions of activities of daily living; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and continual episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from that situation or to experience exacerbations of signs and symptoms. Tr. at 421–22. Ms. Willis also found that Plaintiff was severely limited in her ability to sit, stand, or walk and she was unable to bend, lift, or stoop. Tr. at 422.

Ms. Willis completed a second progress summary on November 10, 2010. Tr. at 437. She noted that Plaintiff continued to struggle significantly with life stressors, financial hardships, and chronic pain. *Id.*

12

On December 2, 2010, Plaintiff presented to Dr. Watkins and reported that her counselor had helped her "so much" and was a "lifesaver."  Tr. at 434.  Despite financial stressors and her father's critical illness, Plaintiff reported adequate sleep most nights and an improvement in depression and her anxious mood.  *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing in February 2011, Plaintiff testified that she lived in a mobile home (owned by her parents) with her husband, who is unemployed.  Tr. at 39–40.  She testified that she voluntarily gave up driving because of her physical and emotional conditions.  Tr. at 42–43.  She testified that she last worked in 2008 as a cashier and stocker at a convenience store and worked as pizza delivery driver prior to that.  Tr. at 45.  She indicated that her doctor told her she did not need to be taking medication for diabetes.  Tr. at 49.  She also said that she had problems with self-diagnosed restless leg syndrome, but was not receiving treatment for it at the time of the hearing.  Tr. at 50.  She testified that she was receiving mental health treatment for depression and anxiety.  Tr. at 52.  She stated she saw a counselor monthly and a psychiatrist every five to six months for a medication check.  Tr. at 52–54.

Plaintiff testified that the primary reason she was not able to engage in full-time work her constant back pain prevented her from standing or sitting very long.  Tr. at 55–56, 69.  She stated that lying down was one of the only things that relieved her pain.  *Id.*

13

She testified that she could walk around for five to ten minutes before resting, but could not stand still at all without feeling like she was going to fall down. Tr. at 57. She stated that she did not use a cane or walker. Tr. at 58. She also testified that she had problems with her left elbow and hand that caused her to drop things and experienced numbness in her right hand. Tr. at 59–61. She testified that her depression caused her to be sad and cry a lot and that her anxiety caused her to "flip out." Tr. at 62. She indicated that her depression medication helped her "feel normal," but that she was still easily depressed. Tr. at 63. Plaintiff testified that she had significant problems with attention, concentration, and memory. *Id.* She testified that she kept her legs elevated all of the time. Tr. at 67. Finally, Plaintiff testified that she only saw Dr. Schleuter on one occasion. Tr. at 79. During the hearing, she asked whether she could stand up to testify. Tr. at 55.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Carroll Crawford reviewed the record and testified at the hearing. Tr. at 71. The VE categorized Plaintiff's PRW as follows: as a cashier as light, unskilled work; as a tile inspector as light, semi-skilled work; as a timekeeper as sedentary, unskilled work (with cleaning and painting as medium work); as a supply clerk as light, semi-skilled work; as a movie rental clerk as light, semi-skilled work; as a pizza delivery driver as light, semi-skilled work; as a shipping clerk as medium, semi-skilled work; as a fast food worker as light, unskilled work; and as a hotel maid as light, unskilled work. Tr. at 72–73. The ALJ described a hypothetical individual of Plaintiff's

14

vocational profile who was limited to simple, routine tasks in a supervised environment with no interaction with the public or team-type interaction with co-workers; could not lift or carry over 10 pounds; could not stand and/or walk over two hours in an eight-hour workday; could occasionally stoop, twist, crouch, kneel, balance, and climb up stairs or ramps; could not crawl, climb up ladders or scaffolds, or walk on uneven terrain; could not operate foot pedals or other controls with the lower extremities; and must avoid hazards such as unprotected heights and dangerous machinery.  Tr. at 73. The VE testified that the hypothetical individual could not perform Plaintiff's PRW.  Tr. at 74. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform.  *Id.*  The VE testified to the following sedentary, unskilled positions that matched the hypothetical: addresser (DOT 209.587-010) (4,000 jobs in South Carolina; 280,000 jobs nationally); and document preparer (DOT 249.587-018) (1,600 jobs in South Carolina; 142,000 jobs nationally).  Tr. at 75.

Upon questioning by Plaintiff's counsel, the VE testified that the following restrictions would preclude substantial work activity: elevating the legs for most of the day; sitting and standing no more than one hour in day; sitting 10 to 15 minutes at a time and standing five to 10 minutes at a time with no meaningful ability to walk on the job site; occasional ability to handle, finger, and feel; and no useful ability to maintain regular attendance and be punctual on the job, sustain ordinary routine without special supervision, complete a normal workday without interruption for psychologically-based

symptoms, or perform at a consistent pace without an unreasonable number of rest periods.  Tr. at 75–78.

   2.     The ALJ's Findings

In his March 1, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2.     The claimant has not engaged in substantial gainful activity since May 18, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairment: degenerative disc disease with lower back pain, major depressive disorder/dysthymic disorder, obesity, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) in that she can lift and carry no more than ten pounds and cannot stand or walk for more than two hours in a workday.  She cannot use foot pedals or other controls with her lower extremities and cannot walk on uneven terrain.  She can occasionally stoop, twist, crouch, kneel, balance, and climb ramps and stairs, but never crawl or climb ladders, ropes and scaffolds.  She must avoid exposure to unprotected heights and dangerous machinery.  By reason of her mental impairments, she is further restricted to simple, routine work in a supervised environment and involving no required interaction with the public or "team-type" interaction with co-workers.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on April 23, 1974, and was 34 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).  She is now 36 years old.

8.     The claimant has more than a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

16

9.      Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

11.      The claimant has not been under a disability, as defined in the Social Security Act, from May 18, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 17–29.

II.      Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      The ALJ improperly discounted the opinion of Plaintiff's treating physician; and

2)      The ALJ erred in assessing Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

17

expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     The ALJ Did Not Err in Evaluating Dr. Schleuter's Opinion

Plaintiff argues the ALJ failed to give sufficient weight to Dr. Schleuter's opinion and failed to provide substantial reasons for dismissing the opinion.  [Entry #30 at 28]. The Commissioner argues the ALJ's handling of Dr. Schleuter's opinion was substantially supported by the record.  [Entry #31 at 9].

On July 30, 2009, Dr. Schleuter completed a Physical Capacities Evaluation Form indicating that Plaintiff could sit and stand one hour in an eight-hour workday, but could not walk at all during the workday.  Tr. at 354.  He opined that she could occasionally (defined as 0–33% of the time) lift one to 10 pounds, but never more than 10 pounds; could occasionally push and pull one to 10 pounds; and should never stoop, kneel, crouch, twist, or climb stairs.  *Id.*  He further opined that Plaintiff could occasionally handle, finger, and feel; could occasionally reach above shoulder and at waist level, but never below waist level; and should never be exposed to heat.  Tr. at 355.  Dr. Schleuter concluded that Plaintiff had permanent limitations since 2003 that precluded her from working in a competitive work environment.  *Id.*

With regard to Dr. Schleuter's opinion, the ALJ stated the following:

That [Physical Capacities Evaluation Form] describes extreme functional limitations in the claimant that would preclude all sustained work activity (the vocational expert confirmed that conclusion in his testimony in response to a question from the claimant's attorney).  The claimant testified that Dr. Schleuter examined her one time at the Weston Community Health Center and never treated her on an ongoing basis.  Thus, it is first clear that Dr. Schleuter is not a treating source for the claimant, and his opinion is not

21

entitled to any particular weight. More importantly, the extreme limitations suggested by Dr. Schleuter are not supported by objective clinical findings of his own or any other physician treating or examining the claimant. The treatment note from the day his document was prepared (Exhibit 16F, page 4) does not describe clinical findings of that severity, nor do the ongoing treatment notes from other physicians at the Weston Center. The two consultative examiners did not make findings sufficient to support that degree of limitation.

Tr. at 26.

The parties initially disagree on whether the ALJ correctly stated that Dr. Schleuter's opinion was "not entitled to any particular weight." Plaintiff contends the doctor was a treating physician and that his opinion should have been evaluated accordingly. [Entry #30 at 21–24]. Plaintiff alternatively argues that even if Dr. Schleuter were not a treating physician, that means only that his opinion was not required to be given controlling weight, not that it was "not entitled to any particular weight." *Id.* at 24. The Commissioner contends the ALJ reasonably determined that Dr. Schleuter was not a treating physician. [Entry #31 at 7].

Pursuant to 20 C.F.R. §416.927(c)(2), a treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record. The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(c)(2). Here, Plaintiff testified at her administrative hearing that she was seen by Dr. Schleuter only once. Tr.

at 79.  Because the rationale for according treating medical sources greater weight (i.e., they are able to provide a detailed, longitudinal picture) is not implicated here, the undersigned does not find that Dr. Schleuter was a treating physician.  Furthermore, the undersigned interprets the ALJ's statement that he need not accord Dr. Schleuter's opinion any particular weight to mean that the opinion is not entitled to the deference accorded treating medical sources.  Consequently, the undersigned recommends a finding that the ALJ did not err in stating that Dr. Schleuter's opinion was not entitled to any particular weight.

Plaintiff next argues that the ALJ's analysis of the opinion is deficient in that it fails to explain why the objective evidence submitted did not support the opinion evidence.  [Entry #30 at 24–25].  In arguing that the objective evidence supports Dr. Schleuter's opinions, Plaintiff cites to the 2006 nerve conduction study, which revealed an entrapment neuropathy at the ulnar nerve at the elbow, and the 2009 MRI, which revealed degenerative disc disease and spinal stenosis.  Tr. at 264–66, 357.  The ALJ specifically discussed the objective findings from these studies in his decision.  Tr. at 19, 23.  He found, however, that the objective clinical findings did not support the extreme limitations suggested by Dr. Schleuter.  Tr. at 26.  Specifically, the ALJ noted that neither Dr. Schleuter's own treatment note from the day on which he issued his opinion, nor the treatment notes of his colleagues support the limitations.  *Id.*  The undersigned's review of the record confirms that the treatment notes from MJWCHC do not document the extreme limitations contained in Dr. Schleuter's opinion.  Furthermore, while the studies

23

cited by Plaintiff may establish conditions that could lead to the limitations suggested by Dr. Schleuter, they do not set forth any functional limitations, speak to the severity of Plaintiff's functional limitations, or provide support for Dr. Schleuter's opinions. For these reasons, the undersigned recommends rejecting Plaintiff's argument on this point.

Finally, Plaintiff argues that in finding that the consultative examinations in the file did not support Dr. Schleuter's opinion, the ALJ did not accurately or fully consider the evaluations of Drs. Tankersley and Moore. [Entry #30 at 26–28]. Plaintiff misstates the ALJ's decision. The ALJ did not state that the opinions of the consultative examiners did not support Dr. Schleuter's opinion. Rather, the ALJ found that the consultative examiners "did not make findings sufficient to support that *degree of limitation*." Tr. at 26 (emphasis added). This distinction is significant because while the opinions of Drs. Tankersley and Moore may have reflected limitations consistent with Plaintiff's alleged conditions, they did not address the severity of her resulting functional limitations.[3] In addition, and contrary to Plaintiff's assertions, the ALJ's decision demonstrates that he considered the opinions of Drs. Tankersley and Moore in detail. Tr. at 23–24. Consequently, the undersigned recommends finding that the ALJ did not err in concluding that the reports of the consulting examiners did not support the degree of limitation opined by Dr. Schleuter.

_____

[3] Plaintiff recognizes that Dr. Tankersley provided no specific assessment or opinion regarding Plaintiff's restrictions and that Dr. Moore stated only that she was noted to have "significant limitations." [Entry #30 at 26–27].

For the foregoing reasons, the undersigned recommends a finding that the ALJ's assessment of Dr. Schleuter's opinion was proper and in compliance with the applicable regulations.

2.    The ALJ Properly Assessed Plaintiff's RFC

Plaintiff next argues the ALJ did not satisfy the requirements of SSR 96-8p in determining her RFC. [Entry #30 at 28–29]. Specifically, she claims the ALJ erred in concluding that her ulnar neuropathy was a non-severe impairment and in failing to find that she had any manipulative restrictions. *Id.* at 29–32. Plaintiff also claims that the ALJ's RFC determination was flawed because he failed to include limitations on her ability to sit and did not properly account for her difficulties with regard to concentration, persistence, or pace. *Id* at 33–37. The Commissioner contends the ALJ's RFC and credibility determinations were supported by substantial evidence. [Entry #31 at 11–12].

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R § 404.1545(a). Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. *Id.*

1.     Ulnar Neuropathy

Plaintiff contends the ALJ should have concluded her ulnar neuropathy was a severe impairment and included manipulative limitations in the RFC determination. [Entry #30 at 29–32].

An impairment is "not severe" or insignificant only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984). It is the claimant's burden to prove that she suffers from a medically-severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987). Plaintiff has failed to meet that burden. While the 2006 nerve induction study and Dr. Moore's clinical findings supported the existence of ulnar neuropathy in Plaintiff's non-dominant arm, Dr. Moore also observed that Plaintiff had normal grip strength. Tr. at 20, 41, 405. Plaintiff concedes this finding. [Entry #30 at 30]. Dr. Moore further noted that Plaintiff's left hand exhibited no tenderness or swelling and that she had a full range of motion in her elbow, forearm, wrist, shoulder, and hand. Tr. at 402, 405. In addition, the ALJ concluded that the medical evidence of record did not demonstrate significant functional limitations resulting from Plaintiff's ulnar neuropathy. Tr. at 20. Consequently, Plaintiff did not meet her burden of establishing ulnar neuropathy as a severe impairment.

To the extent, however, that the ALJ may have erred in finding Plaintiff's alleged arthritis not to be a severe impairment, Plaintiff has suffered no harm. *See Mickles v.*

*Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error"). A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). The undersigned agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he considers that impairment in subsequent steps. *See Washington v. Astrue*, 698 F.Supp.2d 562, 580 (D.S.C. 2010) (collecting cases).

Here, in addition to addressing it specifically at step two, the ALJ considered Plaintiff's alleged disability due to ulnar neuropathy in determining her RFC. Tr. at 22–25. The ALJ first noted Plaintiff's testimony regarding problems with her left hand and elbow, then summarized the findings of Drs. Tankersley and Moore. Tr. at 22–24. Dr. Tankersley found Plaintiff's hands were slightly swollen and that she had a positive Tindel's sign in her right hand, but noted a full range of motion in Plaintiff's upper extremities. Tr. at 23. Dr. Moore indicated that sensory testing confirmed some left ulnar neuropathy, but that Plaintiff had normal grip strength and full range of motion in her upper extremities. Tr. at 24. The ALJ then concluded that the clinical picture reflected in the treatment records showed quite limited findings that did not support the

degree of limitations asserted by the Plaintiff.  Tr. at 25.  He noted that she had mostly good ranges of motion and motor strength.  *Id.*  Finally, he stated that the objective clinical findings from Plaintiff's treating and examining sources supported the RFC determination, which did not include any manipulative limitations.  *Id.*

Because the ALJ properly considered all of the relevant medical evidence and concluded that neither the objective tests nor the treatment records supported Plaintiff's alleged manipulative limitations, he did not err in omitting this limitation from her RFC.

### 2.     Ability to Sit

Plaintiff next contends that the ALJ improperly found that she could sit without restrictions.   [Entry #30 at 33–36].   She relies on her own testimony regarding her inability to sit for long periods and claims the testimony is supported by the objective medical evidence.  *Id.*  Plaintiff's allegation of error is, at its core, a challenge to the ALJ's credibility determination.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher* v. *Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).  "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, ¶ 5.  In evaluating the intensity, persistence, and limiting

28

effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig* v. *Chater*, 76 F.3d 585, 591–96 (4th Cir. 1996). The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC. Tr. at 22.

Throughout the RFC determination and again in his discussion of Plaintiff's credibility, the ALJ noted the limited objective findings to support the Plaintiff's alleged degree of limitation. Tr. at 25. In making his credibility determination, however, the

ALJ did not rely solely on the lack of objective evidence. As he is required to do, he cited additional reasons why Plaintiff's testimony was not credible. *Mickles*, 29 F.3d at 921. Most significantly, he noted conflicts between Plaintiff's testimony and the treatment records. The ALJ found Plaintiff's testimony regarding her initial visit to ABMHC conflicted with the treatment notes. Tr. at 25. She testified that she drove herself to that visit and that no member of her family was being treated for a mental health disorder. *Id.* The records from ABMHC, however, indicate that Plaintiff's mother accompanied her to the visit and that she was also receiving mental health treatment at the same facility. *Id.* The ALJ also identified a discrepancy between Plaintiff's statement to Dr. Moore that she sometimes used a walker and her testimony that she did not use a walker. *Id.* The ALJ noted that Plaintiff testified that she received virtually no benefit from her medications. *Id.* Treatment records, however, do not reflect such complaints. *Id.* Finally, the ALJ noted that the records reflected Plaintiff's non-compliance with her medications. Tr. at 25–26.

The ALJ's decision sets forth the grounds upon which he appropriately relied in discounting Plaintiff's subjective complaints. Because the ALJ's determination not to fully accept Plaintiff's alleged limitations, including her inability to sit for long periods, is supported by substantial evidence, the undersigned recommends finding that the ALJ properly evaluated Plaintiff's credibility and did not err in excluding her alleged sitting limitation from her RFC.

3.     Mental Impairments

Relying on a single out-of-circuit case, Plaintiff next argues that the ALJ's RFC determination failed to properly take into account her deficiencies with concentration, persistence, or pace stemming from her mental impairments.  [Entry #30 at 36–37].

At step two of the sequential evaluation process, the ALJ found that Plaintiff's major depressive disorder/dysthymic disorder and anxiety were severe impairments.  Tr. at 19.  At step three, he found that Plaintiff had mild restrictions in ADLs with moderate difficulties in social functioning and concentration, persistence, or pace.  Tr. at 20. Because of those mental impairments, he limited Plaintiff's RFC to simple, routine work in a supervised environment.  Tr. at 21.  He further restricted her to work involving no required interaction with the public or "team-type" interaction with co-workers.  *Id.*

Precedent from this District holds that the RFC restrictions imposed by the ALJ sufficiently account for Plaintiff's moderate difficulties in concentration, persistence, or pace.  *See Smith v. Astrue*, C/A No. 9:09-351-SB-BM, 2010 WL 3257738, at *4 (D.S.C. June 4, 2010) (finding no reversible error where ALJ found the plaintiff had moderate difficulties in maintaining concentration, persistence, or pace and limited the plaintiff to the performance of simple, routine tasks in a supervised environment with no required interaction with the public or team-type interaction with coworkers), *aff'd*, 2010 WL 3257736 (Aug. 16, 2010); *Gibbs v. Astrue*, C/A No. 9:09-1081-HFF-BM, 2010 WL 3585502, at *8 (D.S.C. Aug 2, 2010) (finding that limiting the plaintiff to a low-stress setting with no more than occasional decision making or changes in the work setting and

no exposure to the general public sufficiently encompassed moderate difficulties in concentration, persistence, or pace), *aff'd*, 2010 WL 3585673 (Sept. 13, 2010); *see also Wood* v. *Barnhart*, C/A No. 05-432, 2006 WL 2583097, at *11 (D. Del. Sept. 7, 2006) (finding that the ALJ adequately accounted for the plaintiff's moderate limitation in maintaining concentration, persistence, or pace by restricting the plaintiff to jobs with simple instructions).  For this reason, the undersigned recommends finding that the ALJ did not err in assessing Plaintiff's RFC.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

February 5, 2013                                          Shiva V. Hodges
Columbia, South Carolina                          United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

32

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).